**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| ELI LILLY COMPANY ) | |
| ) | |
| *Plaintiff*, ) | |
| ) | |
| v. ) | Case No. 1:25-cv-00401-RGA |
| ) | |
| STRIVE PHARMACY LLC d/b/a ) | |
| STRIVE COMPOUNDING ) | |
| PHARMACY ) | |
| ) | |
| *Defendant*. ) | |

**DECLARATION OF NATE HILL**

I, Nate Hill, declare and state as follows:

1. I am the Chief Executive Officer and a co-founder of Strive Pharmacy LLC d/b/a Strive Compounding Pharmacy ("Strive").

2. As a member of Strive, and through my duties as CEO, I am familiar with Strive's business, including its structure and operations and general marketing strategy.

3. As a compounding pharmacy, Strive is authorized to mix or change certain aspects of a medication based on what a medical provider has determined is best for a patient and their health.

4. Removing allergens or changing the method of delivery (so from a pill to an easy-to-dissolve sublingual tab) are common examples of changes Strive makes as a compounding pharmacy.

5. There are lots of other reasons that a medical provider may instruct a compounding pharmacy like Strive to change or "personalize" a medicine, as we often say. For example, we often receive pretty complex prescriptions and instructions from medical providers about how to specially tailor hormone therapies for patients. Based on a patient's bloodwork, the provider may conclude that a patient is deficient in any number of hormones and then provide a prescription and specific instructions about what specific hormones are needed and in what amounts and delivery methods to optimize the patient's therapy.

6. Compounding may also often occur when the provider instructs the pharmacy to alter the amount of a medication's dose, like when a provider has determined that the patient is too sensitive to a medication, which would make the dosage on the medicine's label too hard for the patient to handle or have increased side effects (and likely increase the chance the patient won't take the medicine).

7. Every medication Strive sells is assigned an SKU (or "Stock Keeping Unit"). And each time Strive receives a prescription and instruction from a medical provider about a new formulation for a particular medicine for a particular patient, Strive creates a new SKU for that particular formulation.

8. Because of the way we handle SKUs, we now have over ten thousand distinct SKUs across all medicines because that is how many different combinations and variations of those medicines that medical providers have created and submitted to Strive over the years, which our pharmacy then compounded and fulfilled. We have 18 unique SKUs in our system for compounded tirzepatide alone, for example.

9. Strive was formed and is headquartered in Arizona. Arizona is also where Strive's founders and members live, along with nearly all of Strive's entire executive board (one member of the executive team lives in Utah).

10. Arizona is where all important decisions are made, whether that's major personnel decisions, decisions about the services and compounds we may provide, which health care providers we'll partner with, or how we'll market our services and who we might market them to.

11. Since starting here in Arizona, we have expanded our offices into other states. Our expansion started out here in the west (California, Utah, and Colorado). We headed east later with our office in Florida. Arizona is still the place where Strive maintains the highest number of employees (more than 250).

12. We have never maintained any physical presence or hired any employees in Delaware. Strive also has never owned or had any interest in any property of any kind in Delaware, maintained any bank accounts in Delaware, sourced any of our products from Delaware, or even

had any contracts with anyone from Delaware (I'm not considering a medication sold to a patient as a "contract").

13. We have sold compounded tirzepatide to patients located in Delaware but very, very little. In 2023, for example, Strive made less than $2,000 worth of compounded tirzepatide sales to patients in Delaware. On a percentage basis, that's roughly .001% of all revenue Strive derived from compounded tirzepatide sales that same year, and sales of compounded tirzepatide to Delaware in 2024 increased only slightly in 2024. About .16% of Strive's compounded tirzepatide sales came from Delaware that year.

14. Just to put that in perspective, Strive fulfilled more than twice as many compounded prescriptions for residents of Wyoming in 2023 and roughly three times as many in 2024 than in Delaware.

15. Based on what I know about our business, our low sales volume in Delaware results partially from our much more established presence out west, and partially because we haven't ever made Delaware a focus of our business or our marketing efforts.

16. We fill many more prescriptions in other markets (especially out west in states like California, Arizona, and Utah). Our approach to Delaware so far has been that if someone from Delaware reaches out for services, we'll respond and provide services (subject, of course, to us being licensed there first and complying with all other rules and regulations). But Strive has not directed anyone to focus on the Delaware market for *any* medication we provide, including compounded tirzepatide, and has no real plans to change that approach.

17. Tirzepatide as a compound has no real connection to Delaware for us (such as being a location where active primary ingredients or others may be sourced). And I'm not aware of any reason that residents in Delaware might have a special need for a medicine like tirzepatide. Tirzepatide is in high demand across the country, and far more in other places (for us, at least).

18. I've read Eli Lilly's complaint against Strive and saw the five providers listed there as doing business with Strive (Ianua Health, Seaside Wellness, Renew Body Wellness Center,

3

Lavish Wellness & Aesthetic, and SlimPhoria). The providers Eli Lilly mentions there are actually good examples of our overall approach to a market like Delaware.

19. We looked into those providers and how we established a relationship with them. Based on that review of our records, any relationship we have with those providers came because they reached out to us first (in Arizona).

20. In fact, after looking into it further, as far as we can tell, Strive has never been physically present in Delaware for any reason, whether for a trade show or even for a sales call at a provider or clinic there.

21. The account executive once assigned to the Northeast region of the country, which included Delaware, lives and works from Florida but has never traveled to Delaware for business. Any communications she has had with a provider in Delaware occurred from her home in Florida (or possibly elsewhere if she was traveling) but not in Delaware.

22. It is possible that Strive also created connection with a Delaware patient or provider through Strive's relationships with various telehealth providers, such as when a Delaware patient pays for a prescription submitted to Strive by a telehealth provider. But Strive did not form any of its relationships with any telehealth network to get into the Delaware market. We have never even asked any telehealth network whether they're in Delaware or to expand the number of providers licensed in Delaware. We leave those issues to the networks and have no input or control over them.

23. The same goes for patients located in Delaware who may purchase a prescribed medicine from Strive, including compounded tirzepatide. On the telehealth side, a provider who is part of a telehealth network can be licensed in Delaware and operating in another state while treating a Delaware patient. But we don't know where a particular patient is located until after receiving a prescription from a provider.

24. Patients may seek refills of a prescription through our website (so long as the provider included refills in the original script). But that's a service we provide to every eligible patient, regardless of where they live.

25. Because we have so little to do with Delaware, forcing Strive to defend itself there would be incredibly difficult and disruptive for me, our executive team, and our company and in a way that I'm concerned would be harmful to our entire compounding business.

26. It goes without saying that we can't match the resources of an Eli Lilly. If you totaled up the gross revenue of every sale of every product we've made since we started, that amount would still be a fraction of the gross revenue that Eli Lilly reported just from sales of tirzepatide and just in the fourth quarter of last year (which was north of $10 billion just in that quarter)—a report I'm aware of given my role and our business.

27. I am concerned about the risk to our business that will come from having our entire executive team, or most of it, in Delaware defending this case for prolonged periods. We are in the middle of building out our new headquarters and a new fulfillment hub here in Arizona and are constantly hosting business partners (such as suppliers, telehealth provider networks, large clinics) here to tour our facilities and vet our services. We cannot perform those essential tasks from across the country and not performing them will directly impact revenues.

28. The five clinics Eli Lilly mentions in the complaint that have done a small amount of business with us highlights an additional way that our case could be hurt if we're forced to defend in Delaware. Besides being limited, our business in Delaware is also a pretty new market for us. We did not start there until 2023. So our dealings with those Delaware providers are pretty limited in sales and time.

29. We have done substantially more business with providers in Arizona where we started and have a few in mind who would testify to rebut some of Eli Lilly's attacks on our business. These providers (whose names I'm not currently providing out of concern Eli Lilly will target them) have a much greater breadth of experience with our business and could speak much more authoritatively to the issues Eli Lilly raises in its complaint. I'm concerned that their testimony won't be available just because of where Eli Lilly decided to sue us.

      I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: 5/28/2025     By: _/s/_